UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 7 |
|  | ) | Case No. 15-10891-MSH |
| MARY L. SMITH | ) |  |
|  | ) |  |
| Debtor | ) |  |
|  | ) |  |
|  | ) |  |
| KATHLEEN WHITCOMB AND SCOTT WHITCOMB | ) |  |
|  | ) |  |
|  | ) | Adversary Proceeding |
| Plaintiffs | ) | No. 15-01079 |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| MARY L. SMITH | ) |  |
|  | ) |  |
| Defendant | ) |  |

**MEMORANDUM OF DECISION**

This adversary proceeding was initiated by the filing of a four-count complaint by Kathleen and Scott Whitcomb against Kathleen's mother, Mary Smith, the debtor in the main case. Count I was resolved through settlement. Summary judgment entered in favor of Ms. Smith as to Counts II and III.[1] Count IV, in which the Whitcombs assert that their claims against Ms. Smith arising from a state court judgment should be excepted from Ms. Smith's bankruptcy discharge was tried before me on June 22, 2016. The following constitutes my findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052 with respect to Count IV of the

---

[1] *Whitcomb v. Smith (In re Smith)*, No. 15-10891-MSH, 2015 WL 7873784, at *1 (Bankr. D. Mass. Dec. 3, 2015).

1

complaint.

## FINDINGS OF FACT

Since the 1960s, Ms. Smith and her husband, William Smith (now deceased), have owned and occupied a home located at 236 Union Street in Hanover, Massachusetts. At the suggestion of the Smiths, in 1999, the Smiths' daughter and son-in-law, Kathleen and Scott Whitcomb, entered into an agreement with them calling for the Whitcombs to move into the property after financing and overseeing the completion of an "in-law" addition which the Smiths would occupy for as long as they wished. The agreement provided that the Whitcombs would pay the costs of construction, as well as a portion of all real estate taxes, utilities and maintenance costs associated with the property, and the Smiths would convey title to the property to the Whitcombs within a reasonable period of time.

The parties estimated that construction costs would total $150,000. In June of 1999 the Smiths borrowed $120,000 from South Shore Savings Bank secured by a first mortgage on the Union Street property to cover part of the construction costs and in July of 2000 the Whitcombs paid the Smiths $33,000 to cover the balance. In the spirit of their agreement, as title to the Union Street property remained in the Smiths' names so the Whitcombs could not enter into a mortgage loan directly, the Whitcombs agreed to take full responsibility for the monthly payments on the Smiths' $120,000 mortgage loan with South Shore Savings Bank. The intention was that when title to the property was transferred to the Whitcombs as provided for in the agreement, the Whitcombs would refinance the mortgage loan in their own names and the Smiths could live out their lives in the new addition "rent free."

In 2000, the addition was completed and occupied by the Smiths and the Whitcombs

2

moved into the main portion of the Union Street property. For the first few years the Whitcombs and Smiths lived in harmony. The Whitcombs were making the monthly mortgage payments to South Shore Savings Bank and paying their share of taxes and utility costs. The families were extremely close. Granted, under their agreement the Smiths were supposed to transfer title to the property to the Whitcombs within a reasonable time and, despite the Whitcombs repeated requests, did not do so, nevertheless, the Whitcombs chose not to press the matter, trusting that their parents would eventually deliver a deed.

By the mid-aughts the family dynamics in the Smith-Whitcomb household began to shift and the relationship between the families started the decline that eventually led to this litigation. The reasons are multifaceted and cumulative. Some are probably so subtle that the parties themselves did not notice and I would be unqualified to diagnose. The evidence at trial, however, established the following causal history.

In 2004 or 2005 the children of one of the Smiths' sons came to live in the Union Street property, one with the Whitcombs and one with the Smiths, when their parents died suddenly and prematurely. This put stress on the Smith-Whitcomb families. Also, during this time, Mr. Smith, who had been diagnosed with symptoms of cognitive deterioration in 1995, began presenting symptoms of Alzheimer's disease that would eventually lead to his death in 2011. Ms. Smith, who had always relied on Mr. Smith to manage the family's finances and who worried about how she would cope financially as Mr. Smith's condition worsened, became acutely concerned about her financial future.

During this time, the Smiths, through repeated re-financings or additional home equity loans, steadily increased the debt on the Union Street property. When the Whitcombs were

informed about these transactions (they were not made aware of all of them) they never failed to suggest to the Smiths that it would be an opportune time for the Smiths to transfer title to the Union Street property to them as they had agreed back in 1999. Mr. Smith, to the extent he was able, did not oppose transferring the title but Ms. Smith consistently stalled and no transfer occurred. These re-financings and equity loans increased the financial burden on the Whitcombs, who felt obligated under their 1999 agreement with the Smiths to pay all mortgage carrying costs. Utility costs were also increasing. At some point Ms. Smith demanded that the Whitcombs, who had been paying mortgage and utility expenses directly to the bank and utility companies, pay her instead at the rate of $600 per week and that she would assume the responsibility to pay the bank and utility companies.

      As the financial demands upon the Whitcombs increased and the Smiths, primarily Ms. Smith, continued to side-step their obligation to transfer to them title to the Union Street property, the Whitcombs resentment began to grow. Matters came to a head in the fall of 2008 during a particularly heated family argument involving the two children of the Smiths' deceased son. During that argument Ms. Whitcomb learned that Ms. Smith had been spreading untruthful gossip among other family members and friends that the Whitcombs had not, despite their obligation to do so, been making mortgage and utility payments on the Smiths' behalf. When Ms. Whitcomb confronted Ms. Smith with her knowledge of Ms. Smith's lies, Ms. Smith's response was to announce that the Union Street property would be sold and both families would be required to move to separate rental apartments. Ms. Smith demanded that the Whitcombs vacate Union Street by June 1, 2009. That demand was followed by a lawyer's letter dated December 24, 2008, informing the Whitcombs that the Smiths owned the Union Street property

4

and demanding that they enter into a non-renewable six month occupancy agreement for the remainder of their residency there.

Uncertain as to what to do but fearing they could be evicted at any moment, the Whitcombs moved out of the Union Street property at the end of February or beginning of March 2009. That same year the Whitcombs brought suit against the Smiths in the superior court department of the Massachusetts trial court to enforce their rights under the 1999 agreement. The case eventually proceeded to a bench trial before Judge Brian A. Davis of the superior court who on August 14, 2014, issued findings and rulings in a sixteen page decision.

Judge Davis found that the Whitcombs had substantially performed their obligations under the 1999 agreement and that the Smiths had materially breached that agreement by, among other things, "steadfastly refusing to transfer title to the property to the Whitcombs and by effectively evicting the Whitcombs from the main house on the property." *Whitcomb v. Smith*, No. 48 Civ. 0599, 12 (Mass. Supr. Ct. August 5, 2014). The court ordered Ms. Smith (Mr. Smith having died in 2011) to perform her obligations under the agreement and convey title to the Union Street property to the Whitcombs.[2] The Whitcombs subsequently moved for limited relief from the superior court's judgment. The motion was granted and on January 20, 2015, Judge Davis entered an amended judgment modifying the procedures by which the Whitcombs would obtain title to the property and also ordering, as an alternative to the specific performance remedy, that the Whitcombs could elect an award of money damages against Ms. Smith in the amount of $270,000.

---

[2] Ms. Smith never sold the Union Street property as she had proclaimed she would in 2008 and continues to reside there today.

5

Less than three months later on March 12, 2015, Ms. Smith filed a petition for relief under chapter 7 of the Bankruptcy Code (11 U.S.C. § 101, *et seq*.) commencing the main case in this court. As of the bankruptcy filing date, Ms. Smith had not complied with the amended judgment. On schedule F (unsecured creditors) of the schedules of assets and liabilities filed by Ms. Smith in support of her bankruptcy petition she listed the Whitcombs as holding an unsecured nonpriority claim against her in the amount of $270,000.

The superior court's final order established liability against Ms. Smith, determined that the Whitcombs' version of the underlying events was "decidedly more persuasive," and stated that Ms. Smith's testimony as to the Whitcombs failure to make mortgage and utility payments "was inconsistent with the documentary evidence and otherwise not credible." There was no explicit finding by the superior court as to whether Ms. Smith acted with fraudulent intent or with willfull and malicious intent to injure the Whitcombs. It was necessary for that determination to be made at the trial in this adversary proceeding.

At the trial, Ms. Smith testified that the reason she refused to transfer title to the Union Street property to the Whitcombs was because her obligation to do so was conditioned upon the Whitcombs' complying with three requirements and the Whitcombs had defaulted on all three. According to Ms. Smith, in exchange for obtaining title the Whitcombs had agreed: (1) to make all mortgage and utility payments; (2) not to make any changes to the main part of the house until title passed to them; and (3) to visit and care for the Smiths, especially Mr. Smith as his illness progressed.

Apart from the Whitcombs being obligated to make mortgage and utility payments, the 1999 agreement was silent as to any of the other conditions identified by Ms. Smith. As for their

6

obligation to make mortgage and utility payments, the record establishes and I find that the Whitcombs faithfully performed that obligation despite impediments interposed by the Smiths as they repeatedly refinanced their mortgage to increase the mortgage debt thereby increasing the financial burden on the Whitcombs. With respect to the other two alleged preconditions that Ms. Smith claimed the Whitcombs violated, not only were they not contained in the 1999 agreement, but even if they had been the evidence supports a finding that the Whitcombs materially complied with those conditions as well. Apart from cosmetic improvements, they did not alter their portion of the property and so long as they lived there they were attentive to the needs of the Smiths, especially the ailing Mr. Smith. I find that Ms. Smith's assertion that the Whitcombs had not complied with their obligations under the 1999 agreement was a pretext to justify in hindsight her improper refusal to transfer title to the Whitcombs of the Union Street property.

Further, the evidence supports a finding that Ms. Smith never intended to abide by the terms of the agreement. At the time the Smiths initiated discussions with the Whitcombs leading to the 1999 agreement, Mr. Smith had already been diagnosed with cognitive deterioration. I find that Ms. Smith entered into the 1999 agreement to transfer the Union Street property never intending to do so, but rather intending to induce the Whitcombs to contribute their money and services to the Smiths. Ms. Smith's trial testimony supports this conclusion. When asked if she had ever intended to comply with the agreement, Ms. Smith repeatedly and vociferously pointed to the Whitcombs' failure to care for Mr. Smith, as justifying her refusal to comply. But this was untrue. I find based on the evidence that during the time they resided at the Union Street property, the Whitcombs were highly attentive to Mr. Smith.

After considering the evidence presented at the trial, including the testimony of the

Whitcombs and Ms. Smith, and having determined the facts to be as set forth above and having independently concluded as Judge Davis had that the Whitcombs' testimony as to the underlying facts was credible while Ms. Smith's was not, I find that despite her agreement to do so, Ms. Smith never intended to carry out her obligation under the 1999 agreement to transfer title to the Union Street property to the Whitcombs and that her conduct from 1999 onward culminating in the superior court judgment against her was the result of Ms. Smith's willful and malicious intent to cause the Whitcombs injury.

## DISCUSSION

*Bankruptcy Code § 523(a)(6): Willful and Malicious Injury*

Bankruptcy Code § 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). "An injury is malicious if it was wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will." *In re Levasseur*, 737 F.3d 814, 818 (1st Cir. 2013) (quoting *Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d 853, 859 (1st Cir. 1997)). "Willfulness requires a showing of intent to injure or at least of intent to do an act which the debtor is substantially certain will lead to the injury in question." *Id.* at 818-19 (citing *In re Neronha*, 344 B.R. 229, 231 (Bankr. D. Mass. 2006)); *see also Geiger v. Kawaauhau*, 523 U.S. 57 (1998).

Generally a debt arising out of a simple breach of contract is not subject to Bankruptcy Code § 523(a)(6) non-dischargeability. *See Mitsubishi Motor Sales of Caribbean, Inc. v. Seda Ortiz,* 418 B.R. 11, 26 (D.P.R. 2009) (citing *Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992)). To qualify for non-dischargeable treatment under § 523(a)(6) some courts require a showing that the breach of contract violates an independent duty arising from principles of tort

8

law, *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1206 (9th Cir. 2001), while others have held that breach of contract debts may be non-dischargeable under § 523(a)(6) if the injury resulting from the breach was intentional or substantially certain to occur, *Williams v. Internat'l Brotherhood of Electrical Workers Local 520 (In re Williams)*, 337 F.3d 504, 510 (5th Cir. 2003).

Those courts holding that Bankruptcy Code § 523(a)(6) requires the existence of an intentional tort do so in reliance on the United States Supreme Court's decision in *Geiger v. Kawaauhau*, 523 U.S. 57 (1998). In *Geiger*, the Supreme Court held that the term "willful" in the statute means a deliberate or intentional injury, not a deliberate or intentional act that leads to injury. *Id.* at 63. While the holding in Geiger seems clear enough, many courts have read into the Supreme Court's opinion an additional holding that § 523(a)(6) applies only to torts even though the words of the statute say no such thing. They do so in reliance on the following observation of the Court:

> Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the consequences of an act," not simply "the act itself."

*Id.* at 61. But an observation by way of analogy or illustration does not a holding make. I am persuaded by the reasoning of the Eleventh Circuit Court of Appeals in *Kane v. Tilghman, Fox, & Bianchi Pa (In re Kane)*, 755 F.3d 1285 (11th Cir. 2014), *cert. denied*, 135 S. Ct. 718 (2014).

> In context, however, that observation, which the Supreme Court quoted directly from the Eighth Circuit's opinion, invokes the concept of an "intentional tort" for a limited purpose. The analogy to intentional torts merely emphasizes that § 523(a)(6) requires a creditor to show that a debtor "intended" the consequences of his actions[.]

*Id.* at 1296; *see also Groman v. Watman (In re Watman)*, No. MW 99-107, 2000 WL 35916015, at *5 n.2 (1st Cir. B.A.P. June 30, 2000) ("Indeed, the *Kawaauhau* decision is capable of such a

9

broad interpretation given its directive that § 523(a)(6) should not apply to knowing breaches of contract. However, a close reading of *Kawaauhau* reveals a less sweeping distinction.").

If the Supreme Court wished to restrict the application of Bankruptcy Code § 523(a)(6) to debts arising from injuries caused by intentional torts, an issue not before it, the Court would have done so explicitly. Rather, in a narrow holding the Court ruled that "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Geiger*, 523 U.S. at 64. Any reference in *Geiger* to intentional torts appears to have been illustrative rather than interpretive.

I conclude that "[Bankruptcy Code §] 523(a)(6) excepts contractual debts from discharge when those debts result from an intentional or substantially certain injury." *Williams*, 337 F.3d at 510; *see also Sanders v. Vaughn (In re Sanders),* 210 F.3d 390, 2000 WL 328136, at *2 (10th Cir. 2000) (unpublished opinion); *Kane*, 755 F.3d at 1296. Based on the facts in this adversary proceeding as recounted above, that is precisely what occurred. The obligation at issue here arose from Ms. Smith's breach of contract and her actions in connection with that breach were intended to and did cause significant injury to the Whitcombs.

Relevant to the degree of maliciousness in this case, Ms. Smith used the arrangement with the Whitcombs to her advantage and to the significant detriment of the Whitcombs. In the superior court action, Judge Davis found that Ms. Smith was motivated "in significant part, by her interest in extracting the available equity from the Property for her own use through a series of mortgage refinancing and new home equity loans." *Whitcomb v. Smith*, No. 48 Civ. 0599, 9 n.5 (Mass. Supr. Ct. August 5, 2014). My review of the evidence at trial leads me to arrive at the same conclusion. Not only did the Smiths induce the Whitcombs into contributing monthly

10

mortgage payments, but they, primarily Ms. Smith due to Mr. Smith's deteriorating mental condition, knowingly caused the amount of those monthly contributions to increase for Ms. Smith's own benefit.

*11 U.S.C. § 523(a)(2)(A): False Representation*

Bankruptcy Code § 523(a)(2)(A) excepts from discharge a debt for "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by… false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). The section is "intended to make certain that bankruptcy protection is not afforded to debtors who have obtained property by means of a fraudulent misrepresentation." *Palmacci v. Umpierrez,* 121 F.3d 781, 786 (1st Cir. 1997). In order to establish that a debt is nondischargeable because it was obtained by a false representation a creditor must show the following: (1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, (2) the debtor intended to deceive, (3) the debtor intended to induce the creditor to rely upon the false statement, (4) the creditor actually relied upon the false statement, (5) the creditor's reliance was justifiable, and (6) the reliance upon the false statement caused damage. *In re Spigel*, 260 F.3d 27, 32 (1st Cir. 2001) (citing *Palmacci*, 121 F.3d at 786).

The First Circuit has stated that "the concept of misrepresentation includes a false representation as to one's intention, such as a promise to act." *Palmacci,* 121 F.3d at 786. An intention not to perform at the time an agreement is entered into is a false representation under Bankruptcy Code § 523(a)(2)(A).

> If, at the time he made his promise, the debtor did not *intend to perform*, then he has made a false representation (false as to his intent) and the debt that arose as a result

11

> thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met). If he did so intend at the time he made his promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made.

*Id.* at 787 (emphasis in original).

The facts adduced at trial support the existence of each of the *Palmacci* factors. Ms. Smith did not intend to perform the 1999 agreement at the time she entered into it. That is a false representation. Her actions were willful and malicious thereby establishing an intent to deceive and to induce the Whitcombs to rely upon her false representation. The Whitcombs justifiably relied on Ms. Smith's false representation and suffered serious damage as a result. Thus I find that Ms. Smith's obligation to the Whitcombs is excepted from discharge not only under Bankruptcy Code § 523(a)(6) but also under Bankruptcy Code § 523(a)(2)(A).[3]

The Whitcombs' complaint seeks a determination of non-dischargeability under Bankruptcy Code § 523(a)(6) only. While the complaint fails to include a count under Bankruptcy Code § 523(a)(2)(A), "[w]hen issues not raised in the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Fed. R. Civ. P. 15(b) (made applicable to this adversary proceedings by Fed. R. Bank. P. 7015). In the absence of a motion from the plaintiff to amend the pleadings, the court may do so *sua sponte. See In re Parker*, 334 B.R. 529, 537 (Bankr. D. Mass. 2005) (citing *Zaino v. Zaino (In re Zaino)*, 316 B.R. 1, 8-11 (Bankr. D.R.I. 2004); *First Am. Title Ins. Co. v. Lett (In re Lett)*, 238 B.R. 167, 187-88 (Bankr. W.D. Mo.1999)).

---

[3] The U.S. Court of Appeals for the First Circuit has held "that sections 523(a)(2)(A) and (a)(6) are not mutually exclusive." *Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d 853, 858 (1st Cir. 1997).

"[C]onsent may be implied in two circumstances: when the opposing party (1) consents through his 'effective engagement of the claim or through his silent acquiescence' or (2) assents to introduction of evidence relevant to the issue at trial." *Vasiliades v. Dwyer*, No. CIV.A. 05-10479-FDS, 2006 WL 1494081, at *6 (D. Mass. May 23, 2006) (citing *Rodriguez v. Doral Mortg. Corp.*, 57 F.3d 1168, 1172 (1st Cir.1995)). But even in the absence of implied consent, "amendment still may be proper if the court concludes that the opposing party will not be prejudiced by the last-minute addition of a new claim." *In re Cumberland Farms, Inc.*, 284 F.3d 216, 226 (1st Cir. 2002).

The evidence introduced at trial was relevant to the issue of whether Ms. Smith falsely represented her intention to comply with the 1999 agreement. She was repeatedly pressed, without objection, as to whether she had ever intended to comply with the agreement.

Furthermore, Fed. R. Civ. P. 54(c), made applicable in bankruptcy by Fed. R. Bankr. P. 7054(a), provides in relevant part that a "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." "This rule has been liberally construed, leaving no question that it is the court's duty to grant whatever relief is appropriate in the case on the facts proved," *U.S. v. Marin*, 651 F.2d 24, 31 (1st Cir. 1991), provided that the granting of relief not prejudice the defendant. *Town of Portsmouth, R.I. v. Lewis*, 813 F.3d 54, 61 (1st Cir. 2016); *see also Rodriguez*, 57 F.3d at 1173 ("Rule 54(c) creates no right to relief premised on issues not presented to, and litigated before, the trier.").

The facts established by the evidence at trial prove that Ms. Smith falsely represented her intention to enter into the 1999 agreement with the Whitcombs. The facts also establish that the Whitcombs relied, to their detriment, on Ms. Smith's false representations. Finding no prejudice

13

to Ms. Smith under the mandates of Fed. R. Civ. P. 15(b) and Fed. R. Civ. P. 54(c), I find that such facts entitle the Whitcombs to relief under Bankruptcy Code § 523(a)(2)(A).

## CONCLUSION

Judgment consistent with this memorandum shall enter in favor of the Whitcombs that pursuant to Bankruptcy Code §§ 523(a)(6) and (a)(2)(A) the obligations of Ms. Smith to the Whitcombs under the judgement of the Massachusetts superior court are non-dischargeable. I will grant the Whitcombs relief from the automatic stay provisions of the Bankruptcy Code to return to the superior court for the purpose of enforcing their judgment in such manner as the superior court deems appropriate.

Dated: July 12, 2016

By the Court,

Melvin S. Hoffman
U.S. Bankruptcy Judge